# Exhibit A

1

2

3

4

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

5
COUNTY OF KING

6
STEVE R. MARICAL, on behalf of himself and all
others similarly situated,

7
                    Plaintiff,

NO.

8
     v.

**SUMMONS (20 DAY)**

9
BOEING EMPLOYEES' CREDIT UNION,

10
                Defendant.

11

12
TO:     BOEING EMPLOYEES' CREDIT UNION
           c/o Mike Ryan, General Counsel
           12770 Gateway Drive South

13
           Tukwila, Washington 98168-3309

14
      A lawsuit has been started against you in the above-entitled court by the Plaintiff. The

15
Plaintiff's claims are stated in the written complaint, a copy of which is served upon you with

16
this summons.

17
      In order to defend against this lawsuit, you must respond to the complaint by stating

18
your defense in writing, and by serving a copy upon the person signing this summons within

19
twenty (20) days after the service of this summons, excluding the day of service, or a default

20
judgment may be entered against you without notice. A default judgment is one where the

21
Plaintiff is entitled to what has been asked for because you have not responded. If you serve a

22

23

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1   notice of appearance on the undersigned person, you are entitled to notice before a default

2   judgment may be entered.

3       You may demand that Plaintiff file this lawsuit with the Court. If you do so, the demand

4   must be in writing and must be served upon the Plaintiff. Within fourteen (14) days after you

5   serve the demand, the Plaintiff must file this lawsuit with the Court, or the service on you of

6   this Summons and Complaint will be void.

7       If you wish to seek the advice of an attorney in this matter, you should do so promptly

8   so that your written response, if any, may be served on time.

9       THIS SUMMONS is issued pursuant to Rule 4 of the Superior Court Civil Rules of the

10  State of Washington.

11      DATED this 28th day of June, 2019.

12                          TERRELL MARSHALL LAW GROUP PLLC

13

14          By:  /s/ Beth E. Terrell, WSBA #26759
                Beth E. Terrell, WSBA #26759
                Email: bterrell@terrellmarshall.com
15              Ari Y. Brown, WSBA #29570
                Email: abrown@terrellmarshall.com
16              Maria Hoisington-Bingham, WSBA #51493
                Email: mhoisington@terrellmarshall.com
17              936 North 34th Street, Suite 300
                Seattle, Washington 98103
18              Telephone: (206) 816-6603
                Facsimile: (206) 319-5450

19

20

21

22

23

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    E. Michelle Drake
     Email: emdrake@bm.net
2    Joseph C. Hashmall
     Email: jhashmall@bm.net
3    BERGER & MONTAGUE, P.C.
     43 SE Main St, Suite 505
4    Minneapolis, MN 55414
     Telephone: (612) 594-5999
5    Facsimile: (612) 584-4470

6    *Attorneys for Plaintiff*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

SUMMONS (20 DAY) – 3

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1

2

3

4

5

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
COUNTY OF KING

| | |
|---|---|
| STEVE R. MARICAL, on behalf of himself and all others similarly situated, | NO. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BOEING EMPLOYEES' CREDIT UNION, | |
| Defendant. | |

## I.  NATURE OF THE ACTION

1.      Plaintiff Steve Marical, on his behalf and on behalf of all others similarly situated, brings this action against Defendant Boeing Employees' Credit Union (BECU). Mr. Marical alleges that BECU has engaged in unfair and deceptive acts and practices and has breached its contractual promises to its members with respect to BECU's overdraft fee program for checking accounts. Specifically, BECU charges its members fees for overdrawing their accounts using one-time debit card or ATM transactions without first obtaining its members' affirmative consent to create overdrafts and be charged fees based on these transactions.

2.      In its Account Agreement, BECU contracts not to charge its members overdraft fees on debit card transactions unless and until the member affirmatively opts-in to BECU's

CLASS ACTION COMPLAINT – 1

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1  overdraft protection program and BECU receives and confirms the member's consent. Federal

2  regulations that BECU specifically incorporates into its Account Agreement require that BECU

3  obtain and then confirm consent in a specified format from each member before creating an

4  overdraft based on an ATM or one-time debit card transaction and charging that member a

5  fee for the overdraft. Despite the language in the Agreements it drafted, BECU does not

6  actually obtain its members' consent before charging overdraft fees based on these

7  transactions.

8        3.      BECU's practice of charging overdraft fees to members who have not

9  affirmatively opted-in to its overdraft program constitutes a breach of its agreement with

10  each member and constitutes an unfair and deceptive practice under Washington law.

11  Plaintiff seeks actual damages based on BECU's breach of its contract and seeks actual and

12  exemplary damages, injunctive relief, and attorneys' fees and costs against BECU based on its

13  unfair and deceptive practices that violate the Washington Consumer Protection Act.

14  **II.  PARTIES**

15        4.      At all times relevant, Plaintiff Marical was a resident of Marysville, Washington,

16  and a member of BECU.

17        5.      Defendant BECU is a Washington credit union headquartered in Tukwila, King

18  County, Washington. BECU has a total of 55 branches, 54 of which are in Washington State.

19  **III.  VENUE AND JURISDICTION**

20        6.      This Court has jurisdiction under the Washington Constitution, Article IV,

21  Section 6; RCW 4.12.020; and RCW 19.86.090.

22

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

7.      Venue is proper under RCW 4.12.020; RCW 4.28.185(a) & (b). BECU's Account Agreement specifies that its agreements are governed by the laws and regulations of the state of Washington, and that any disputes regarding its Agreements "must be brought in and are subject to the jurisdiction of a court in King County, Washington."

8.      The claims of Plaintiff Marical and the members of the Class are brought under state law causes of action. No federal question exists in this matter.

9.      Federal jurisdiction is inappropriate under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(4)(A), because more than two-thirds of the members of the proposed plaintiff class in the aggregate are citizens of Washington; significant relief is sought from Defendant BECU by members of the proposed class; the alleged conduct of Defendant BECU forms a significant basis for the claims asserted by the proposed class; Defendant BECU is a citizen of Washington; the principal injuries resulting from the alleged conduct or any related conduct of Defendant BECU were incurred in Washington; and during the three-year period preceding the filing of this action, no other class action has been filed asserting same or similar factual allegations against Defendant BECU on behalf of the same or other persons. Alternatively, federal jurisdiction is inappropriate under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(4)(B), because two-thirds or more of the members of the proposed plaintiff class in the aggregate and the primary Defendant BECU are citizens of the state of Washington.

**IV.  FACTS COMMON TO PLAINTIFF AND THE CLASS**

10.      Defendant BECU is a Washington credit union with approximately $19.6 billion in assets. BECU provides banking services to more than 1.16 million customers that it refers to

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    as "members." The vast majority of these members are residents of Washington. With some

2    discrete exceptions, living or working in Washington State is a condition to becoming a BECU

3    member.

4          11.     As a member-owned credit union, BECU actively markets itself as being more

5    consumer friendly to its members than banks and other financial institutions. On its website,

6    BECU claims "[b]ecause credit unions do well when members do well, we have a vested

7    interest in the financial health of our members." … "Compared to average bank customers,

8    BECU members may save more as a result of our lower rates and fewer fees."[1] And BECU's

9    advertising campaign boasts that "[a]s a member owned credit union, we've always believed

10   in people over profit. People over everything actually."[2]

11         12.     As one of its banking services, BECU issues debit cards to its checking account

12   members. These cards allow BECU members electronic access to their checking accounts and

13   to debit funds directly from their accounts at "Point of Sale" (POS) transactions. POS

14   transactions include purchases from merchants in person or online and withdrawing cash

15   from Automated Teller Machines (ATMs). BECU members may also write checks, schedule

16   Automated Clearing House (ACH) payments, and engage in other transactions that debit from

17   their checking accounts.

18         13.     When a BECU determines that a transaction exceeds the balance in a member's

19   checking account, it reserves the option (though not the responsibility) to pay that transaction

20

21   [1] BECU, *Credit Union Difference*, https://www.becu.org/members-matter/about-membership/credit-unions-vs-banks (last visited June 25, 2019).

22   [2] *See, e.g.*, BECU Credit Union, *All Together Different: BECU* (2019), https://www.youtube.com/watch?v=CHykeHdQH20 (last visited June 25, 2019).

23

CLASS ACTION COMPLAINT – 4

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1  by creating an overdraft and then charging the member a $25 fee for each transaction it

2  deems an overdraft.

3       14.    BECU maintains overdraft programs that it foists on its members. BECU's

4  "Standard Overdraft" involves BECU simply paying the transaction that exceeds the member's

5  balance and then removing the amount of any overdraft, plus a $25 fee for each transaction,

6  from the member's next deposit. According to its Account Agreement and to Federal

7  regulations incorporated into that agreement, BECU will not create an overdraft and charge a

8  fee based on one-time debit card or ATM transactions unless and until the member has given

9  prior consent to do so.

10  **A.    The recognized unfairness, deceptiveness, and punitive nature of overdraft
        programs.**

11

12       15.    While financial institutions, including BECU, typically market their overdraft

13  programs as a "service" provided for the "benefit" of their customers, overdraft programs are

14  anything but a benefit. A 2008 FDIC report on its study of overdraft programs detailed the

15  abusive practices various financial institutions employed in their overdraft programs. The

16  report found that overdraft fees can carry an effective interest rate that exceeds 3,500

17  percent. It also found that more than 38 percent of accounts held by customers in lower-

18  income areas are assessed overdraft charges. Moreover, the report noted the extent to which

19  these fees have the tendency to create a domino effect in that the imposition of a single

20  overdraft fee makes additional fees more likely. This in turn makes it all the less likely that the

21

22

23

CLASS ACTION COMPLAINT – 5

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1   account balance will reach positive territory, and more likely that still more overdrafts will

2   occur.[3]

3           16.     Most of the time, the high cost of an overdraft fee is unfairly punitive. In one

4   study, more than 90 percent of the customers who were assessed these fees had over-drafted

5   their accounts by mistake. The Pew Center on the States, *Overdraft America: Confusion and*

6   *Concerns about Bank Practices* 4 (May 2012).[4] And more than 60 percent of the transactions

7   resulting in an overdraft fee were under $50. The Pew Charitable Trusts, *Overdrawn* (June

8   2014).[5] In Plaintiff's experience, as illustrated below, transactions as little as a couple of

9   dollars triggered a $25 overdraft fee – or interest of more than 1000%. A majority of

10  consumers who were assessed overdraft fees do not recall opting-in to an overdraft program,

11  and more than two-thirds of them would have preferred that the financial institution decline

12  the transaction rather than pay and charge a fee. *Id*. at 5, 10.

13          17.     Almost by definition, the most financially vulnerable consumers are the ones

14  most likely to be assessed overdraft fees. *Id*. at 1. For example, a 25-year-old is 133 percent

15  more likely to pay an overdraft penalty fee than a 65-year-old. *Id*. at 3. And people of color,

16  who are disproportionately people of low economic status, are 83 percent more likely to incur

17  an overdraft fee than those who are white. *Id*. More than 50 percent of the customers

18  assessed overdraft fees earn under $40,000 per year. *Id*. at 4.

19

20  [3] *See* Federal Deposit Insurance Corporation, *FDIC Study of Bank Overdraft Programs* (November 2008),
    https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf.

21  [4] The Pew Center on the States, *Overdraft America: Confusion and Concerns about Bank Practices* (May 2012),
    https://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/SCIBOverdraft20America1pdf.pdf.

22  [5] The Pew Charitable Trusts, *Overdrawn: Persistent Confusion and Concern About Bank Overdraft Practices* (June
    2014, https://www.pewtrusts.org/~/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf.

23

CLASS ACTION COMPLAINT – 6

1    18.    Substantial litigation has occurred over the past years regarding the unfair and

2    deceptive overdraft fee practices engaged in by financial institutions. This litigation included a

3    full bench trial in Federal District Court in the Northern District of California that resulted in a

4    $203 million verdict against Wells Fargo Bank. The court's ensuing findings of fact and

5    conclusions of law detailed the bank's overdraft practices and emphatically condemned them

6    as "gouging and profiteering." *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1104

7    (N.D. Cal. 2010). The court found the bank practices to generate overdraft fees to be "so

8    pernicious that it should be allowed, if at all, only upon a showing that it was within the

9    reasonable expectations of the parties. Here the proof is the opposite." *Id*. at 1123-24.

10    19.    Significant litigations against dozens of banks and credit unions, along with

11    nationwide settlements based on allegations of unfair and deceptive overdraft practices,

12    followed the Wells Fargo verdict. Banks and credit unions have cumulatively returned nearly

13    two billion dollars in overdraft fees taken from their respective customers and members. A

14    number of settlements included commitments by banks to change their practices. Bank of

15    America, for example, committed to cease allowing debit card transactions to create

16    overdrafts.

17    **B.    Regulation E was enacted to curb the most pernicious abuses involving
     overdraft fees.**

18

19    20.    In its 2008 study, the FDIC found that banks imposed the vast majority of

     overdraft fees through "automated" overdraft programs – computerized programs by which

20

     the bank paid customer's overdraft transactions using a standardized procedure or matrix,

21

     and found that over 75% of banks automatically enrolled customers in automated overdraft

22

     programs without first obtaining their affirmative consent. The study further found that banks

23

CLASS ACTION COMPLAINT – 7

1   that operated automated overdraft programs received 90% of the overdraft fees taken in by

2   the entire study population. The vast majority of these overdraft fees were triggered by

3   customers using debit cards at ATMs and in one-time POS transactions.[6]

4         21.    Several studies noted that automated overdraft programs posed considerable

5   risks to customers – particularly where customers had been enrolled in overdraft programs

6   without their affirmative consent, and often without their knowledge.[7]

7         22.    In 2005 and again in 2008, the Office of the Comptroller of the Currency (OCC),

8   Board of Governors of the Federal Reserve System (Board), Federal Deposit Insurance

9   Corporation (FDIC), and National Credit Union Administration (NCUA) (collectively "the

10   Agencies.") issued rules entitled "Joint Guidance on Overdraft Protection Programs" ("Joint

11   Guidance").

12         23.    According to the Agencies, "injury [caused by overdraft charges] is not

13   outweighed by countervailing benefits. … This is particularly the case for ATM withdrawals

14   and POS debit card transactions where, but for the overdraft service, the transaction would

15   typically be denied, and the consumer would be given the opportunity to provide other forms

16   of payment without incurring any fee." 73 F.R. 28904-01 (May 19, 2008).

17         24.    The Joint Guidance also advised financial institutions to "[a]lert customers

18   before a transaction triggers any fees. When consumers attempt to withdraw or transfer

19   funds made available through an overdraft protection program, provide a specific consumer

20

---

21   [6] See *id*. at 9, 27, 68; *see also* Consumer Financial Protection Bureau, *Data Point: Checking account overdraft* (July 2014), http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf.

22   [7] *See* Consumer Financial Protection Bureau, *CFPB Study of Overdraft Programs* (June 2013), at 18, n.k (citing studies), http://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf.

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R.

2   9127, 9132 (February 24, 2005). The Joint Guidance further advises that "[t]his notice should

3   be presented in a manner that permits customers to cancel the attempted withdrawal or

4   transfer after receiving the notice." *Id*.

5        25.    Similarly, the list of "best practices" regarding overdraft protection that the

6   American Bankers Association has recommended includes informing customers, before they

7   access funds, that a particular POS or ATM transaction will cause them to incur an overdraft

8   fee. 73 F.R. 28904-01, 28929.

9        26.    In response to the lack of transparency of automated overdraft programs, the

10  Federal Reserve Board issued an amendment to Regulation E, which provides that financial

11  institutions are permitted to charge overdraft fees on ATM and one-time debit card charges

12  <u>only</u> after obtaining the customer's affirmative consent (opt-in). 12 C.F.R. § 1005.17.

13  Regulation E has since been recodified and is now administered by the Consumer Financial

14  Protection Bureau (the "Bureau"). The prohibition against charging overdraft fees on the

15  covered transactions became effective on July 1, 2010 for new accounts, and on August 15,

16  2010 for existing accounts.

17       27.    The opt-in requirement applies to any one-time debit card transaction,

18  whether the card is used, for example, at a point-of-sale, in an online transaction, or in a

19  telephone transaction.[8] A financial institution may comply with the rule if it adapts its systems

20  to identify debit card transactions as either one-time or recurring.  If it does so, the financial

21

---

22  [8] *See* Consumer Financial Protection Bureau, *Official Interpretation of 12 C.F.R. §1005.17(b)*, https://www.consumerfinance.gov/policy-compliance/rulemaking/regulations/1005/17/.

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   institution may rely on the transaction's coding by third parties as a one-time transaction as

2   opposed to a recurring debit card transaction.

3       28.     If a financial institution fails to obtain, and then confirm, that a customer has

4   been provided the information in a manner that meets all requirements of the opt-in rule and

5   obtain the customer's affirmative consent to be charged for overdraft transactions, the

6   institution is prohibited from charging the consumer overdraft fees on ATM and one-time

7   debit card transactions.

8       29.     To qualify as affirmative consent, a written opt-in agreement must include the

9   following characteristics:

10          a.      The customer must be given a notice in writing or electronically

11  (segregated from all other electronic information), describing the overdraft policy, including

12  the dollar amount of any fees that will be charged for an overdraft;

13          b.      The opt-in consent must be obtained separately from other consents

14  and acknowledgements;

15          c.      The consent cannot serve any purpose other than opting-in to the

16  overdraft program;

17          d.      The customer must be given the opportunity to affirmatively check a

18  box choosing to enroll in an overdraft program, and the consent cannot be a pre-selected

19  checked box; and

20          e.      The financial institution may not provide different terms for the account

21  depending on whether the customer opted-in to the overdraft program. See, 12 C.F.R.

22  §1005.17(b) and Official Interpretation.

23

CLASS ACTION COMPLAINT – 10

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    30.    Since the Regulation E opt-in requirement was enacted, multiple studies have

2    confirmed the efficacy of requiring an affirmative opt-in to curb the most abusive overdraft

3    practices, and again confirmed the disadvantageous and even abusive nature of overdraft

4    programs.

5    31.    In a white paper outlining the findings of a study of the effects Regulation E had

6    on consumers, the Bureau noted that when actually given the choice of whether to opt-in to

7    an overdraft program, one trade association comprising 18 member institutions reported that

8    84% of the banking customers across those institutions chose not to opt in to an overdraft

9    program.[9]

10    32.    The Bureau's findings confirmed how harmful it is for a banking customer to

11    participate in an overdraft program. The Bureau found that account holders who opt-in to an

12    overdraft program are three times as likely to have more than ten overdrafts per year than

13    account holders who do not opt-in to an overdraft program.[10] Consumers that opted-in paid

14    an average of $22 per month in overdraft and NSF fees while consumers that did not opt-in

15    paid an average of $3 per month.[11] Stated another way, opted-in consumers averaged 7.78

16    overdrafts per year as compared with non-opted-in consumers who averaged only 1.99

17    overdrafts per year.[12]

18

19

20    [9] *See CFPB Study of Overdraft Programs*, supra note 7, at 29.

    [10] *Data Point: Checking account overdraft* (July 2014), at 13,
21    http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf.

    [11] *Id*. at 9.
22    [12] Consumer Financial Protection Bureau, *A Closer Look: Overdraft and the Impact of Opting-In* (January 19,
    2017), https://files.consumerfinance.gov/f/documents/201701_cfpb_Overdraft-and-Impact-of-Opting-In.pdf

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

33.     The Bureau's study found overdraft "protection services" to be harmful even for customers who frequently over-drafted their accounts. The "median opted-in frequent overdrafter pays 260 percent more overdraft fees than the median frequent overdrafter who is not opted in . . . ."[13]

34.     The Bureau further found that opted-in accounts were more likely to be closed involuntarily by the financial institution than accounts that had not opted in.[14]

35.     As a result of litigation and regulation, banks have been forced to scale back on efforts to create revenue from overdraft fees. Moebs, an independent industry research firm, recently reported that the instances of overdraft transactions at national and state banks continued a multi-year declining trend and declined by 6.93 percent in 2018. But this decrease has been offset by credit unions that have increasingly turned to overdraft fees as a lucrative profit center in recent years. In 2018 alone, credit union overdraft revenue rose by an additional 5.72 percent. *See* Moebs Services Inc., *Overdraft Revenue Inches Up in 2018* (March 27, 2019).[15]

36.     Notwithstanding the Regulation E requirements, credit unions nationally still managed to generate $7.4 billion in overdraft fees in 2012.[16] That reflected a 15-percent increase in overdraft fees from 2007. *Id*. at 16. At the time of the study, overdraft and NSF

---

[13] Consumer Financial Protection Bureau, *Data Point: Frequent Overdrafters* (August 2017), at 32-33, https://files.consumerfinance.gov/f/documents/201708_cfpb_data-point_frequent-overdrafters.pdf.

[14] *CFPB Study of Overdraft Programs*, *supra* note 7, at 34-35.

[15]MOEBS, *Overdraft Revenue Inches up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%202018%2000032719-1.pdf?ver=2019-03-27-115625-283.

[16] *CFPB Study of Overdraft Programs*, *supra* note 7, at 14.

CLASS ACTION COMPLAINT – 12

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    fees generated more 50 percent of all fee income for credit unions and constituted 11.6

2    percent of net income. *Id*. at 15.

3    **C.    BECU charges overdraft fees without obtaining consent from its members in violation of provisions in its member agreement.**

4    
5        37.    Like many financial institutions, BECU has long maintained overdraft programs

6    and automatically enrolled its members into one or more of its programs. Upon the

7    enactment of Regulation E, BECU was forced to amend its account agreement to comply with

8    opt in requirements.

9        38.    In its current form, Section 10(a)(2) of the BECU Account Agreement (effective

10   August 2018) states "**only after we receive and confirm your prior consent**, we may authorize

11   and pay everyday debit card POS transactions that will overdraw your account . . . ."

12   (emphasis added).

13       39.    Whereas BECU states that affirmative consent is required before it will create

14   overdrafts based on one-time debit card transactions, it nonetheless automatically enrolls its

15   members into an automated overdraft program that applies to transactions other than debit

16   card or ATM transactions or that is linked to a member's other accounts such as a line of

17   credit or savings account. BECU automatically enrolls members into these overdraft programs

18   even when the member has chosen ***not*** to opt into the one BECU overdraft program about

19   which the member was informed.

20       40.    BECU's Account Agreement affirmatively incorporates the Regulation E

21   requirements. It states: "The Account Agreements are governed by the bylaws of BECU,

22   federal laws and regulations, the laws and regulations of the state of Washington, and local

23   clearinghouse rules …. All Accounts opened with BECU are subject to all applicable laws,

CLASS ACTION COMPLAINT – 13

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  including federal law and regulations of the National Credit Union Administration, **the**

2  **Consumer Financial Protection Bureau**, and the Washington Financial Institutions Individual

3  Account Deposit Act." BECU Account Agreement (August, 2018), §27 (emphasis added).

4       41.     Whereas BECU incorporated the regulations the Consumer Financial Protection

5  Bureau promulgated, including Regulation E, and amended its account agreement to comply

6  with the regulation's opt-in requirements, BECU does not appear to have adjusted its actual

7  practices to comply with the regulations. Despite its contractual provisions, BECU has

8  continued to create overdrafts and charge members fees based on ATM and one time debit

9  card transactions even when the member has not opted-in as required.

10  **D.**     **BECU charged Plaintiff Steve Marical overdraft fees without his consent.**

11       42.     Mr. Marical opened a personal checking account at BECU in approximately

12  2010. He did not sign an agreement to opt-in to an overdraft program or otherwise agree to

13  enroll in a BECU overdraft program.

14       43.     Mr. Marical served in active duty in the U.S. Army for ten years before being

15  honorably discharged, including combat tours in the war in Afghanistan. As a result of combat,

16  Mr. Marical is currently disabled and draws disability payments from the Veterans

17  Administration that are deposited directly into his BECU account.

18       44.     Despite not ever having opted-in to any overdraft program, BECU has

19  repeatedly created overdrafts based on Mr. Marical's ATM and one-time POS transactions and

20  has charged him $25 overdraft fees based on each of those overdrafts. The following are a

21  few examples of dozens of wrongful overdraft fees BECU has removed from Mr. Marical's

22  account since 2013.

23

CLASS ACTION COMPLAINT – 14

45.     On February 13, 2016, BECU unilaterally charged, and later removed $50 from Mr. Marical's account based on two debit card overdraft transactions.  BECU charged a $25 fee based on a $19.02 debit card purchase at a Little Caesar's, and a second $25 fee based on a $10 debit card purchase at a Shell gas station (a 250% charge). BECU coded each transaction on its account statement as "POS Withdrawal."

46.     The next day, on February 14, BECU unilaterally charged, and later removed another $50 from Mr. Marical's account based on two more debit card withdrawals. BECU charged a $25 overdraft fee based on a $25 debit card purchase at a Snohomish County solid waste facility. It then charged another $25 overdraft fee based on a $6.52 debit card purchase at a gas station (a 383.4% charge). BECU did not provide Mr. Marical with notice that his account was overdrawn and that any of these transactions on February 13 or 14 would cause him to incur a $25 fee at any time that would have allowed Mr. Marical to avoid the fee by paying in cash or by terminating the transactions.

47.     On June 27, 2016, BECU charged Mr. Marical a $25 overdraft fee, then charged a second $25 overdraft fee two days later, on June 29, and unilaterally removed these charges from Mr. Marical's account. According to his monthly account statement, each of these fees was triggered by a one-time debit card transaction: once when he used his debit card to pay an $83.75 car licensing fee, and once when he used his debit card to make a $3.49 purchase online (a 716% charge).[17] Mr. Marical received no notification at the time of the transactions that triggered these charges that the transactions would subject him to a fee.

---

[17] BECU's account statements appear to be deliberately unclear and do not itemize which transaction triggered the overdraft fee. Each of the fees follows a particular transaction and can be reasonably assumed to be tied to the preceding transaction. However, an analysis of BECU's statement indicates that the overdraft fee listed as

CLASS ACTION COMPLAINT – 15

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

48.     On July 11, 2016 BECU removed $50 from Mr. Marical's account based on two debit card transaction: one when he paid $32 for a haircut, and a second $25 charge when he paid $3.69 in an online transaction using his debit card.

49.     On July 25, 2016, BECU unilaterally charged, and ultimately removed, $25 from Mr. Marical's account as an overdraft fee based on a $2.00 online debit card transaction (a 1,250% charge). The following day, BECU charged and later removed another $25 from Mr. Marical's account based on a $287.50 debit card transaction.

50.     On May 22, 2017, BECU charged, and ultimately removed $25 from Mr. Marical's account based on a $39.32 debit card purchase at a donut shop. As in all of the above listed transactions, BECU provided no notice of an impending overdraft or fee at a time that would have allowed Mr. Marical to avoid the overdraft fees by using other methods of payment or by foregoing the transactions.

51.     On July 6, 2017, Mr. Marical's paycheck of $4,138.80 was directly deposited into his checking account. That day, believing he had significant funds in his account, Mr. Marical transferred $1,000 to his BECU savings account. He then withdrew $1,000 using a BECU operated ATM. BECU apparently did not credit the deposit until after it posted the withdrawals. It charged Mr. Marical a $25 overdraft fee for each of these transactions. BECU provided no notice at the time of these transactions of the fact that it would charge Mr. Marical overdraft fees for completing the transactions at that time. Had he received notice, he

posting on June 27 was actually based on a $3.99 POS Withdrawal that occurred on July 1. A review of BECU's internal data will be required to conclusively tie each overdraft fee to its corresponding transaction.

CLASS ACTION COMPLAINT – 16

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  could have delayed the transfer to savings and the withdrawal to later that day or to the

2  following day and thus avoided the overdraft fees.

3      52.   In May 2019, Mr. Marical wrote a letter to BECU notifying it that he did not

4  believe he had ever opted into an overdraft program or authorized the payment of overdrafts

5  based on debit card or ATM transactions. He invited BECU to send him any documentation

6  that it believes showed him to have opted in.  He further notified BECU that it should treat his

7  letter as notice of a request to be removed from any overdraft protection program. BECU

8  responded by sending Mr. Marical a blank opt-out form. It did not provide any document that

9  indicated he had ever affirmatively opted-in to an overdraft program.

**V.  CLASS ACTION ALLEGATIONS**

11     53.   Plaintiff brings this case as a class action under CR 23(a) and (b)(3).

12     54.   The proposed Class is defined as follows:

> All Washington residents against whose account BECU charged
> one or more overdraft fees based on a one-time debit card or
> ATM transaction from June 28, 2013 through the date of final
> judgment and for whom BECU cannot show that the member
> provided affirmative consent to charge overdraft fees based on
> such transactions.

Excluded from the Class is any entity in which BECU has a controlling interest, officers or

director of BECU, this Court and any employees assigned to work on the case, and all

employees of the law firms representing Plaintiff and the Class.

19     55.   Certification of Plaintiff's claims for class-wide treatment is appropriate

because Plaintiff Marical can prove the elements of his claims on a class-wide basis using the

same evidence that would be used to prove those elements in individual actions alleging the

same claims.

CLASS ACTION COMPLAINT – 17

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

56.    <u>Numerosity</u>. The members of the Class are so numerous that a joinder of all members would be impracticable. Defendant BECU is the largest credit union in the state of Washington with more than 1.16 million members. While the exact number of members in the Class is unknown at this time, it is reasonable to assume the Class includes thousands of members.

57.    <u>Commonality and Predominance</u> (CR 23(a)(2) and CR 23(b)(3)). There are numerous questions of law and fact common to the Plaintiff and Class members. Those common questions of law or fact predominate over questions that may affect only individual Class members. The common issues arising from this conduct that effect Plaintiff and members of the Class predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. The questions of law and fact common to Plaintiff and the Class members include, among others, the following:

a.    Whether BECU has engaged in a common course of conduct that breaches its contractual agreement with its members;

b.    Whether BECU has engaged in a common course of charging its members overdraft fees without obtaining prior consent;

c.    Whether BECU has obtained, and retained, consent from class members in the form and manner required by 12 CFR § 1005.17;

d.    Whether BECU's common courses of conduct are unfair within the meaning of RCW 19.86.020;

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    e.    Whether BECU's common courses of conduct are deceptive within the

2  meaning of RCW 19.86.020;

3    f.    Whether BECU's common courses of conduct occurred in trade or

4  commerce and are injurious to the public interest;

5    g.    Whether BECU's common courses of conduct have caused Plaintiff

6  Marical and Class members to be injured in their business or property;

7    h.    Whether injunctive relief is appropriate to remedy BECU's unfair and

8  deceptive acts and practices; and

9    i.    The nature and extent of Class-wide injury and the measure of

10  compensation for such injury.

11    58.    Typicality. Plaintiff's claims are typical of the claims of the Class. The evidence

12  and legal theories regarding BECU's alleged wrongful conduct are substantially the same for

13  Plaintiff and all of the class members, as the relevant agreements and the challenged practice

14  of charging overdraft fees without first obtaining affirmative consent are uniform for all Class

15  members.

16    59.    Adequacy. Plaintiff will fairly and adequately protect the interests of the Class.

17  Plaintiff has retained capable and competent attorneys who have significant experience in

18  complex and class action litigation, including consumer rights litigation. Plaintiff and his

19  counsel are committed to prosecuting this action vigorously on behalf of the Class and have

20  the financial resources to do so. Neither Plaintiff nor his counsel have interests that are

21  contrary to or that conflict with those of the Class.

22

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    60.    <u>Superiority.</u> Plaintiff and Class members have suffered and will continue to

2    suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. Absent a

3    class action, however, most Class members would likely find the cost of litigating their claims

4    prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation

5    because it conserves judicial resources, promotes consistency and efficiency of adjudication,

6    provides a forum for small claimants, and deters illegal activities. There will be no significant

7    difficulty in the management of this case as a class action. The Class members are readily

8    identifiable from Defendant's records.

9                              **VI.  CLAIMS**

                         **FIRST CAUSE OF ACTION**
10                         **(Breach of Contract)**

11    61.    Plaintiff realleges and incorporate by reference each and every allegation set

12    forth in the preceding paragraphs.

13    62.    Under the Account Agreement, which was drafted by and is binding on BECU,

14    Defendant promised to pay one time debit card transactions that would overdraw a member's

15    account and to charge an overdraft fee based on that transaction only after obtaining

16    Plaintiff's and Class members' prior consent before authorizing and paying debit card point of

17    sale transactions that will overdraw Plaintiff's checking account.

18    63.    BECU specifically incorporated the regulations of the Consumer Financial

19    Protection Bureau as governing the terms of its Agreements. Such regulations include the

20    Regulation E prohibition against charging overdraft fees based on one-time debit card

21    transactions and ATM transactions without first obtaining and confirming a member's

22    affirmative consent in a specified manner.

23

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

CLASS ACTION COMPLAINT – 20

1    64.    Defendant breached its promise by failing to obtain and confirm Plaintiff's and

2  Class members' consent before charging overdraft fees against Plaintiff's and Class members'

3  accounts based on one-time debit card and ATM transactions.

4    65.    Plaintiff and members of the Class have performed all, or substantially all of the

5  obligations imposed on them under the Deposit Agreement.

6    66.    As a result of BECU's acts in breach of its Agreements, Plaintiff and the Class

7  have been deprived of money from each of their respective BECU accounts in amounts to be

8  determined at trial and are entitled to recovery of such damages, including prejudgment

9  interest thereon.

10                     **SECOND CAUSE OF ACTION**

11    **(Violation of the Washington Consumer Protection Act, Chapter 19.86 RCW—
Unfair Acts and Practices)**

12    67.    Plaintiff realleges and incorporates by reference each and every allegation set

13  forth in the preceding paragraphs.

14    68.    Plaintiff and members of the Class are "persons" within the meaning of RCW

15  19.86.010(1).

16    69.    Defendant is a "person" within the meaning of RCW 19.86.010(1).

17    70.    Defendant's common courses of unfair conduct in violation of RCW 19.86.020

18  have caused and are likely to continue causing substantial injury to consumers that is not

19  reasonably avoidable by the consumers nor outweighed by countervailing benefits to

20  consumers or competition.

21    71.    Defendant's common courses of unfair conduct occur in trade or commerce

22  and impact the public interest because Defendant is in the business of providing financial

23

CLASS ACTION COMPLAINT – 21

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    services to tens of thousands of consumers in Washington. Hundreds of thousands of

2    Washingtonians have been affected by Defendant's unfair acts and practices.

3        72.    Defendant's common courses of unfair conduct caused injury to the business

4    or property of Plaintiff and the Class.

5        73.    Plaintiff and the Class have been damaged in amounts to be determined at trial

6    and under RCW 19.86.090, Plaintiff and the Class are entitled to recover such damages,

7    including interest thereon, as well as exemplary damages, attorneys' fees and costs.

8        74.    Under RCW 19.86.090, Plaintiff and the Class are entitled to an order enjoining

9    Defendant BECU from engaging in the illegal acts and practices described above.

10       75.    Plaintiff and the Class are entitled to additional equitable relief as the Court

11   deems appropriate, including but not limited to disgorgement for the benefit of the members

12   of all or part of the ill-gotten gains Defendant has received in connection with the illegal acts

13   described above.

14                          **THIRD CAUSE OF ACTION**

15   **(Violation of the Washington Consumer Protection Act, Chapter 19.86 RCW—
Deceptive Acts and Practices)**

16       76.    Plaintiff realleges and incorporates by reference each and every allegation set

17   forth in the preceding paragraphs.

18       77.    Defendant's common courses of conduct have had the capacity to deceive a

19   substantial portion of the public.

20       78.    Defendant's common courses of deceptive conduct occur in trade or commerce

21   and impact the public interest because Defendant is in the business of providing financial

22

23

CLASS ACTION COMPLAINT – 22

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    services to tens of thousands of consumers in Washington. Thousands of Washingtonians

2    have been affected by Defendant's deceptive acts and practices.

3         79.    Defendant's common courses of deceptive conduct caused injury to the

4    business or property of Plaintiff and the Class.

5         80.    Plaintiff and the Class have been damaged in amounts to be determined at trial

6    and under RCW 19.86.090, Plaintiff and the Class are entitled to recover such damages,

7    including interest thereon, as well as exemplary damages, attorneys' fees and costs.

8         81.    Under RCW 19.86.090, Plaintiff and the Class are also entitled to an order

9    enjoining Defendant from engaging in the illegal acts and practices described above.

10        82.    Plaintiff and the Class are also entitled to additional equitable relief as the

11   Court deems appropriate, including but not limited to disgorgement for the benefit of the

12   Class of all or part of the ill-gotten gains Defendant has received in connection with the illegal

13   acts described above.

14                        **FOURTH CAUSE OF ACTION**

15                              **(Conversion)**

16        83.    Plaintiff realleges and incorporate by reference each and every allegation set

17   forth in the preceding paragraphs.

18        84.    BECU had and continues to have a duty to maintain and preserve its members'

19   checking accounts and to prevent their diminishment through its own wrongful acts.

20        85.    BECU has wrongfully collected overdraft fees from Plaintiff and the Class

21   members and has taken specific and readily identifiable funds from their accounts in payment

22   of these fees in order to satisfy them.

23

CLASS ACTION COMPLAINT – 23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

86.    BECU has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and Class members, without legal justification.

87.    BECU continues to retain these funds unlawfully without the consent of Plaintiff or the Class members.

88.    BECU intends to permanently deprive Plaintiff and the Class members of these funds.

89.    These funds are properly owned by Plaintiff and the Class members, not BECU, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

90.    Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

91.    BECU has wrongfully converted these specific and readily identifiable funds in violation of law.

92.    BECU's conduct is continuing.

93.    As a proximate result of this wrongful conversion, Plaintiff and the Class members have suffered and continue to suffer damages.

94.    By reason of the foregoing, Plaintiff and the Class members are entitled to recover from BECU all damages and costs permitted by law, including all amounts that BECU has wrongfully converted.

95.    The financial benefits derived by BECU rightfully belong to Plaintiff and the Class members. BECU should be compelled to disgorge in a common fund for the benefit of

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1  Plaintiff and the Class members all wrongful or inequitable proceeds it received. A

2  constructive trust should be imposed upon all wrongful or inequitable sums BECU received

3  that is traceable to Plaintiff and the Class members.

**VII.  PRAYER FOR RELIEF**

4

5          WHEREFORE, Plaintiff, on his own behalf and on behalf of members of the Class, prays

6  for judgment against Defendant as follows:

7          A.      Certify the proposed Class;

8          B.      Appoint Steve Marical as representative of the Class and appoint the

9  undersigned attorneys as counsel for the Class;

10         D.      Enter judgment in favor of Plaintiff and the Class and against Defendant BECU

11 on all causes of action alleged;

12         D.      Declare that the acts and practices of Defendant BECU violate Washington law;

13         E.      Issue a permanent injunction under RCW 19.86.090 enjoining and restraining

14 Defendant BECU from continuing to engage in the unlawful conduct alleged in this complaint;

15         F.      Award Plaintiff and Class members actual and exemplary damages in amounts

16 to be proven at trial;

17         G.      Award Plaintiff's counsel attorneys' fees, costs, and expenses as allowed by

18 law;

19         H.      Award Plaintiff and the Class pre-judgment and post-judgment interest as

20 allowed by law; and

21         I.      Grant Plaintiff and the Class such other and additional relief as is just and

22 proper under applicable law.

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   RESPECTFULLY SUBMITTED AND DATED this 28th day of June, 2019.

2          TERRELL MARSHALL LAW GROUP PLLC

3

          By: _/s/ Beth E. Terrell, WSBA #26759_____

4           Beth E. Terrell, WSBA #26759
           Email: bterrell@terrellmarshall.com

5           Ari Y. Brown, WSBA #29570
           Email: abrown@terrellmarshall.com

6           Maria Hoisington-Bingham, WSBA #51493
           Email: mhoisington@terrellmarshall.com

7           936 North 34th Street, Suite 300
           Seattle, Washington 98103

8           Telephone: (206) 816-6603
           Facsimile: (206) 319-5450

9

10          E. Michelle Drake
           Email: emdrake@bm.net

11           Joseph C. Hashmall
           Email: jhashmall@bm.net

12           BERGER & MONTAGUE, P.C.
           43 SE Main St, Suite 505

13           Minneapolis, MN 55414

14           Telephone: (612) 594-5999
           Facsimile: (612) 584-4470

15          *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com